UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
WE THE PROTESTERS, INC. d/b/a Campaign Zero, and                  :
STAY WOKE, INC.,                                                  :
                                                                  :
                              Plaintiffs,                         :
                                                                  :
              -v-                                                 :
                                                                  :
SAMUEL SINYANGWE and MAPPING POLICE                              :
VIOLENCE INC.,                                                    :
                                                                  :
                              Defendants.                         :
                                                                  :
------------------------------------------------------------------X      22 Civ. 9565 (JPC)
                                                                  :
SAMUEL SINYANGWE and MAPPING POLICE                              :      OPINION AND ORDER
VIOLENCE INC.,                                                    :
                                                                  :
                              Counterclaim Plaintiffs,            :
                                                                  :
              -v-                                                 :
                                                                  :
WE THE PROTESTERS, INC. d/b/a Campaign Zero,                      :
                                                                  :
                              Counterclaim Defendant.             :
                                                                  :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

     Plaintiff-Counterclaim Defendant We the Protesters, Inc. d/b/a Campaign Zero

("Campaign Zero") moves to dismiss three of the thirteen counterclaims brought by Defendants-

Counterclaim Plaintiffs Samuel Sinyangwe and Mapping Police Violence, Inc. (collectively,

"Defendants").  For the reasons that follow, the Court grants Campaign Zero's motion in part and

denies it in part.

## I.  Background

### A.  Facts[1]

Given the relatively narrow scope of the instant motion, the Court recites below only those allegations in the Amended Counterclaims that are most relevant to the Court's analysis.

Sinyangwe is "a Stanford-trained data scientist and policy analyst" who "created the Mapping Police Violence ['MPV'] project" in late 2014.  Am. Counterclaims ¶¶ 13-14.  For the project, Sinyangwe "collected and assembled information on reported incidents of police violence across the country; analyzed the data to determine patterns, trends, and statistics; and compiled his work into a database designed to track and analyze such incidents on an ongoing basis." *Id.* ¶ 14.  Defendants allege that Sinyangwe's "particular selection, coordination, and arrangement of the database, including structural and organizational components that he created specifically for the Mapping Police Violence project, were original and unique," since "[t]hey had not been applied to this subject matter before and represented a new and substantial contribution to the field." *Id.*

On or around March 1, 2015, Sinyangwe publicly launched a website on Squarespace that hosted the MPV project (the "MPV Original Website"). *Id.* ¶¶ 15, 17.  This website "contained the original data compilations, text, and graphics—including a distinctive map element—that Mr. Sinyangwe created to display, present, and explain the results of his research and analysis in a unique, accessible, and compelling way." *Id.* ¶ 15.  Defendants allege that "Sinyangwe created every element of the project and website—including, for example, his particular selection, coordination, and arrangement of the database, accompanying text, custom color scheme, pin

_____

[1] Except where expressly noted otherwise, the following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Amended Counterclaims, Dkt. 32 ("Am. Counterclaims"), and the documents incorporated therein by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

graphics, background, and visuals invoking a sense of danger, urgency, and a call to action—with that goal in mind." *Id.* ¶ 16. The details of the MPV Original Website are discussed at length below. *See infra* III.A.

Around the same time, Sinyangwe entered into discussions with fellow activists DeRay McKesson, Johnetta Elzie, and Brittany Packnett-Cunningham over potential collaborations at least partly stemming from the MPV project. *Id.* ¶¶ 10, 18. Defendants allege that McKesson "purchased the domain mappingpoliceviolence.org" on or around March 1, 2015; namely, the same date that the MPV Original Website was launched. *Id.* ¶ 19. "Visitors attempting to navigate to mappingpoliceviolence.org would be transferred to the [Original] MPV Website on Squarespace, where they would see Mr. Sinyangwe's work on the Mapping Police Violence project." *Id.* Separately, the same four individuals also co-founded We the Protesters d/b/a Campaign Zero ("Campaign Zero"), a nonprofit organization that was incorporated on June 29, 2015. *Id.* ¶¶ 10, 21. Defendants allege that the quartet "envisioned that their new collaboration would use modern technology and tools like social media and digital communications to raise awareness, promote evidence-based activism, and propose policy-driven solutions informed by Mr. Sinyangwe's preexisting work on the Mapping Police Violence project." *Id.* ¶ 20.

In the ensuing years, "Sinyangwe continued to work on the Mapping Police Violence project, . . . updating the underlying data compilations and making various improvements to the MPV [Original] Website." *Id.* ¶ 24. Because of his efforts, "the name 'Mapping Police Violence' acquired distinctiveness between March 2015 and 2021 as the associated Mapping Police Violence project and MPV [Original] Website quickly rose to prominence in the public eye, garnering widespread media coverage and numerous citations in publications and articles." *Id.* ¶ 27. Defendants also allege that only Sinyangwe "worked on or exercised any control or authority over

the creative components of the MPV [Original] Website" and that "Sinyangwe never conveyed his ownership interest in his original work or assigned his intellectual-property rights to Campaign Zero, even when Campaign Zero explicitly asked him to do so years later in 2021." *Id.* ¶¶ 25, 26.

The crux of the Amended Counterclaims concerns Sinyangwe's 2021 departure from Campaign Zero and the organization's response thereto. Defendants allege that Sinyangwe and another co-founder had concerns over a new campaign titled #8CantWait that McKesson launched "in 2020, in the wake of George Floyd's murder and the unprecedented protests that followed." *Id.* ¶ 31. Sinyangwe, who had already resigned from the organization's board of directors, was apparently also "surprised and troubled . . . by the changes [he] saw [around the same time], including Mr. McKesson's stacking of the board of directors with his personal friends and his eventual appointment as the organization's executive director without the agreement of the organization's other co-founders." *Id.* ¶¶ 31, 32. Nevertheless, prior to Sinyangwe's departure, "Campaign Zero also asked Mr. Sinyangwe for the first time to sign an employment agreement and assignment of intellectual property, which he refused to do" despite Campaign Zero "attempt[ing] to force" Sinyangwe to do so by not reimbursing him for contributions he made to the organization separate from his MPV project work. *Id.* ¶ 33.

Sinyangwe proceeded to incorporate Mapping Police Violence, Inc. as a nonprofit in September 2021. *Id.* ¶ 35. Around the same time, "a representative of Campaign Zero contacted Squarespace directly and, without Mr. Sinyangwe's knowledge or permission, [unsuccessfully] attempted to gain access to Mr. Sinyangwe's account—the only means to access or edit the backend of the MVP [Original] Website." *Id.* ¶ 36. Defendants characterize this episode as a "failed hijacking attempt." *Id.* After this attempt failed and "without authorization or permission from Mr. Sinyangwe, Campaign Zero simply ripped off the public-facing contents of the MPV

[Original] Website and published a copycat version on the domain mappingpoliceviolence.org" (the "MPV Copy Website") in early 2022.  *Id.* ¶ 37.  The Amended Counterclaims appear to suggest that visitors attempting to access the Mapping Police Violence project were now being directed to the MPV Copy Website instead of the MPV Original Website that was hosted on the aforementioned Squarespace page.  *Id.* ¶ 39.  Campaign Zero also re-registered the website— apparently in March 2023—"to facilitate its wrongdoing."  *Id.* ¶ 38.

The similarities between the original and copy websites are a central focus of this Opinion and Order and are discussed extensively below.  Generally, Defendants fault Campaign Zero for "set[ting] up the MPV Copy Website to divert to Campaign Zero visitor donations intended to support the Mapping Police Violence project, and so that email addresses of visitors who subscribed through the MPV Copy Website would be added to Campaign Zero's audience list for marketing purposes."  *Id.* ¶ 40.  They further object to Campaign Zero allegedly "remov[ing] from the MPV Copy Website language crediting Mr. Sinyangwe as the creator of the Mapping Police Violence project and the contents of the MPV [Original] Website."  *Id.*  Defendants also assert that Campaign Zero only made "minor modifications" to the MPV Copy Website even after Sinyangwe sent a letter "demanding that [Campaign Zero] cease its counterfeiting."  *Id.* ¶¶ 42, 43.  Defendants provide the following figures to illustrate the modifications:

**Original MPV Website**                    **MPV Copy Website**[2]



*Id.* at 32 fig. 5.

**Original MPV Website**



**MPV Copy Website[3]**



*Id.* at 33 fig. 6.

Defendants allege that "Campaign Zero's counterfeiting worked," as "[v]isitor traffic to the [MPV Original Website] plummeted[ and d]onations, media outreach, volunteer recruitment, partnerships, sponsorships, and other forms of support for the real Mapping Police Violence project slowed significantly." *Id.* ¶ 44. Sinyangwe has moreover "suffer[ed] significant professional and reputational harm . . . as a result of the many flaws in the crude imitation now presented to the public on the MPV Copy Website." *Id.*

**B. Procedural History**

Plaintiffs Campaign Zero and Stay Woke, Inc. commenced this action on November 9, 2022.  Dkt. 1 ("Complaint").[2]  Defendants answered the Complaint on January 13, 2023 and also asserted ten counterclaims against Campaign Zero.  *See* Dkt. 16 at 33-42.  On February 3, 2023, Plaintiffs filed a letter motion in anticipation of a motion to dismiss two of the original counterclaims, Dkt. 18, and Defendants responded to this letter on February 14, 2023, Dkt. 20.  The Court then ordered Defendants to "advise . . . whether they wish to amend their Answer to the Complaint asserting Counterclaims" in light of the arguments for dismissal previewed in Plaintiffs' February 3, 2023 letter.  Dkt. 21.  While Defendants initially indicated that they did not wish to do so, Dkt. 22, they nevertheless filed the operative Amended Counterclaims on April 4, 2023, Dkt. 32, approximately three weeks after Campaign Zero filed its motion to dismiss the original counterclaims, Dkts. 30-31.  Defendants assert thirteen counterclaims in their amended pleading. *See* Am. Counterclaims at 34-48.  Defendants attribute this change to Sinyangwe having received copyright registrations in the interim.  *See* Dkt. 39 ("Opposition") at 6 n.2.  The Court then denied Campaign Zero's original motion to dismiss without prejudice as moot and afforded Campaign Zero the opportunity to respond to the Amended Counterclaims.  Dkt. 33.

Campaign Zero filed the instant motion to dismiss on April 19, 2023.  Dkt. 34 ("Notice of Motion"), 35 ("Motion").  Campaign Zero moves to dismiss (1) Counterclaim One for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, *see* Am. Counterclaims ¶¶ 45-51;

---

[2] Plaintiffs bring seventeen causes of action against Defendants.  *See* Complaint ¶¶ 107-198.  Broadly speaking, they allege that Defendants "wrongfully seiz[ed] control of Campaign Zero's valuable internet domains, st[ole] charitable donations intended for Campaign Zero, and falsely claim[ed] to be affiliated with Campaign Zero's social justice initiatives long after [Sinyangwe] left the organization, in order to financially benefit himself and ventures unaffiliated with Campaign Zero."  *Id.* ¶ 1.

(2) Counterclaim Two for removal of copyright management information ("CMI") under the Digital Millenium Copyright Act ("DMCA"), 17 U.S.C. § 1202, *see* Am. Counterclaims ¶¶ 52-56; and (3) Counterclaim Seven for cyberpiracy under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125, *see* Am. Counterclaims ¶¶ 81-85.  *See* Notice of Motion at 1; Motion at 6-24.  Defendants filed their opposition on May 3, 2023, Dkt. 39, and Campaign Zero filed its reply on May 10, 2023, Dkt. 41 ("Reply").  Defendants also requested oral argument on Campaign Zero's motion.  Dkt. 40.

## II.  Standard of Review

"In evaluating a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6), courts apply the same standard as a motion to dismiss a complaint."  *Wells Fargo Bank, Nat'l Ass'n v. GC SHL, LLC*, No. 21 Civ. 8940 (JPO), 2022 WL 3599131, at *2 (S.D.N.Y. Aug. 23, 2022) (internal quotation marks omitted).  To survive a motion to dismiss pursuant to Rule 12(b)(6), a counterclaim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the [counterclaimant] pleads factual content that allows the court to draw the reasonable inference that the [counterdefendant] is liable for the misconduct alleged."  *Id.*  A counterclaim's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the [counterclaim] and draw[] all inferences in the [counterclaimant]'s favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

## III.  Discussion

As noted above, Campaign Zero moves to dismiss three of Defendants' thirteen counterclaims: (1) Counterclaim One for copyright infringement under the Copyright Act, (2) Counterclaim Two for removal of CMI under the DMCA, and (3) Counterclaim Seven for cyberpiracy under the ACPA.  The Court will discuss each in turn.

### A.  Copyright Infringement

First, Campaign Zero moves to dismiss Counterclaim One, in which Defendants allege that Campaign Zero engaged in copyright infringement through the MPV Copy Website.  *See* Am. Counterclaims ¶¶ 45-51.  "To establish a claim of copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Abdin v. CBS Broad., Inc.*, 971 F.3d 57, 66 (2d Cir. 2020) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).  "To satisfy the second element, a plaintiff must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work."  *Id.* (internal quotation marks and alteration omitted).

Campaign Zero mounts several challenges to Defendants' copyright infringement counterclaim, which is based on Sinyangwe's MPV-related copyright registrations.[3]  First, Campaign Zero claims that Defendants failed to specify the copyrightable works upon which Campaign Zero infringed, Motion at 8, alluding to the maxim that "[w]hen pleading a claim of

---

[3] These are registered under Copyright Numbers TX 9-239-667 and TX 9-239-669.4, Am. Counterclaims ¶ 47; copies thereof can be accessed at the U.S. Copyright Office's copyright catalog, https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?DB=local&PAGE=First.  *See Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (holding that a district court is "entitled to take judicial notice of . . . federal copyright registrations, as published in the Copyright Office's registry").

copyright infringement a plaintiff must plead which specific original works are the subject of the copyright claim . . . [and] identify each instance of infringement with specificity; it is not sufficient for a plaintiff to list examples of works that were allegedly infringed and then claim that other, unidentified works were also infringed," *Paul Rudolph Found. v. Paul Rudolph Heritage Found.*, No. 20 Civ. 8180 (CM), 2022 WL 4109723, at *7 (S.D.N.Y. Sept. 8, 2022) (internal quotation marks omitted). *See* Motion at 8 ("Nowhere in his amended pleading does Sinyangwe identify the specific work that was allegedly infringed, or how Campaign Zero's content is supposedly substantially similar to that unidentified work. This alone warrants dismissal.").

The Court disagrees. As Defendants point out, Opposition at 11, the Amended Counterclaims at the very least allege that the MPV Copy Website copied the MPV Original Website's calendar and map features, Am. Counterclaims at 32 fig. 5, 33 fig. 6, within the context of the latter's "unique data compilations, text, and graphics—including a distinctive map element," *id.* ¶¶ 6, 15, 16 (describing Sinyangwe's "particular selection, coordination, and arrangement of the database, accompanying text, custom color scheme, pin graphics, background, and visuals invoking a sense of danger, urgency, and a call to action"). Similar allegations have been found to satisfy the specific work requirement. *FC Online Mktg., Inc. v. Burke's Martial Arts, LLC*, No. 14 Civ. 3685 (SJF), 2015 WL 4162757, at *12 (E.D.N.Y. July 8, 2015); *see id.* at *13 ("[P]laintiff attached to the amended complaint a copy of defendants' allegedly infringing website, with the elements it claims that defendants copied from its [w]ebsite highlighted in yellow."). This is not a scenario in which, for instance, the copyright in question included a large volume of materials and Defendants failed to specify which works within that volume that were copied. *See Paul Rudolph Found.*, 2022 WL 4109723, at *7 (limiting a copyright infringement claim to two out of 152 works that were the subject of the relevant registration when the plaintiff alleged infringement

of the entire registration but only provided examples involving two works); *Cole v. John Wiley &*

*Sons, Inc.*, No. 11 Civ. 2090 (DF), 2012 WL 3133520, at *12 (S.D.N.Y. Aug. 1, 2012) ("Not only

is it inadequate to base an infringement claim on overly-inclusive lists of copyrighted works, but

it is also insufficient to list certain works that are the subject of an infringement claim, and then

allege that the claim is also intended to cover other, unidentified works."). Campaign Zero's

argument on this basis is thus unavailing.

Campaign Zero also argues that Defendants have inadequately pleaded a copyright

infringement claim based on the MPV Original Website's text, map feature, and "selection,

coordination, and arrangement" of killings by police. Motion at 8-10. The Court will address

these three bases in turn.

As to text, Campaign Zero argues that Defendants "do[] not identify any text that Campaign

Zero allegedly copied." *Id.* at 8. Defendants appear to posit that the Amended Counterclaims'

reference to "Sinyangwe's original selection, coordination, and arrangement of the Mapping Police

Violence . . . text" includes the accompanying text highlighted in Figure 3 of the Amended

Counterclaims. Am. Counterclaims ¶ 47; *id.* at 25 fig. 3; *see* Opposition at 11. It is not entirely

apparent to the Court whether Defendants have alleged that the text featured in Figure 3 was

specifically infringed by the MPV Copy Website, although it bears noting that that version of the

text is alleged to have appeared on the website the year before the "ripp[ing] off" occurred. Am.

Counterclaims ¶ 37; *id.* at 25 fig. 3. Nevertheless, the Court can readily infer that the MPV Copy

Website allegedly copied the text accompanying "the public-facing contents of the MPV Website,"

Am. Counterclaims ¶ 37, given that the Amended Counterclaims allege that this "accompanying

text" constituted an "element of the . . . website" that Sinyangwe created, *id.* ¶ 16. And, in any

case, the requirement that a plaintiff specify the works that form the subject of the copyright claim

does not mean that a plaintiff must "assert exactly which individual elements of the copyrighted works were infringed." *Klauber Bros., Inc. v. Jenny Yoo Collection, Inc.*, No. 16 Civ. 9260 (LLS), 2017 WL 4082483, at *2 (S.D.N.Y. July 18, 2017); *see Restellini v. Wildenstein Plattner Ins., Inc.*, No. 20 Civ. 4388 (AT), 2021 WL 4340824, at *3 (S.D.N.Y. Sept. 22, 2021).  In other words, even if the Court were to accept Campaign Zero's argument that Defendants fail to identify the text that it copied, that alone would not warrant dismissal of Defendants' copyright infringement claim.[4]

Campaign Zero's map-related arguments take a different tack in claiming that "any original elements in th[e map features showcased at Figure 6 on Pages 33 of the Amended Counterclaims] are entirely different." Motion at 8.  As Defendants point out, Opposition at 9, maps are protectable under the Copyright Act's "pictorial, graphic, and sculptural works category," 17 U.S.C. § 101. Campaign Zero does not appear to contest this point but rather challenges whether the map features highlighted in the Amended Counterclaims are substantially similar.  "The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Abdin*, 971 F.3d at 66 (internal quotation marks and alteration omitted).  As Defendants appear to concede, Opposition at 10, "[w]here, as in this case, a work incorporates unprotectible elements from the public domain, [the court] appl[ies] a more discerning observer test, which requires substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed work." *Abdin*, 971 F.3d at 66 (internal quotation marks

---

[4] To be sure, Defendants must still identify the protectible elements of the MPV Original Website to make out a substantial similarity claim.  The Court only notes that Defendants need not plead the specific text on which Campaign Zero allegedly infringed in order to satisfy the threshold "specific work" requirement.  Were Defendants proceeding on a theory that there is substantial similarity between the text featured in Figure 3 and text in the MPV Copy Website, that theory would likely prove less availing, since the Court has before it no equivalent text from the MPV Copy Website with which it could compare the text in Figure 3.

and alterations omitted).  The Court "examine[s] the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting."  *Id.* (internal quotation marks omitted).  The Second Circuit has also analyzed maps under the substantial similarity standard not "feature-by-feature, . . . [but rather with a] focus on the overall manner in which [the mapmaker] selected, coordinated, and arranged the expressive elements in its map, . . . to depict the map's factual content."  *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 748 (2d Cir. 1998).

Here, Defendants appear to identify elements of the map such as the "custom color scheme, pin graphics, background, and visuals invoking a sense of danger, urgency, and a call to action" as the protectible or original aspects of the map graphic.  Am. Counterclaims ¶ 16; *see also id.* at 23 fig. 2, 26 fig. 4, 33 fig. 6.  Viewing the features of the MPV Original Website's map and the MPV Copy Website's map—or at least the version that Campaign Zero allegedly put up after having received Sinyangwe's February 2022 letter—in their totality, the Court concludes that the two maps "leave . . . sufficiently different impressions" such that Defendants likely could not make out a copyright infringement claim based on these maps alone.  *Streetwise Maps*, 159 F.3d at 748; *see Abdin*, 971 F.3d at 73 (finding on review of a Rule 12(b)(6) motion that a plaintiff had failed to adequately allege substantial similarity and holding that "where the total concept and feel of competing works is different, we will not find infringement" (internal quotation marks omitted)); *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) ("[I]n certain circumstances, it is entirely appropriate for a district court to resolve th[e] question [of substantial similarity] as a matter of law, . . . because no reasonable jury, properly instructed, could find that the two works are substantially similar." (internal quotation marks omitted)).  Defendants point to the fact that both maps "depict[] the number of shootings geographically and by density." Opposition at 11.  That is, of course, a factually accurate statement, but that assertion also fails to

take into account the vastly different ways in which that information is presented on the two maps. Viewing the maps, the Court simply cannot credit Defendants' assertion that Campaign Zero only made "minor modifications" to the map element.  Am. Counterclaims ¶ 43.  The modified MPV Copy Website map appears to present the sum total of the incidents by either state or county—and the corresponding density of these jurisdictions as a whole—whereas the MPV Original Website appears to show the specific location of each incident with a must higher level of geographical detail and therefore allows a viewer to assess density based on these pins, as opposed to on a jurisdictional level.  *See* Am. Counterclaims at 33 fig. 6.  Other elements of the map also differ: the "custom color scheme, pin, graphics, [and] background" on the MPV Original Website's map that Defendants assert "invok[e] a sense of danger, urgency, and a call to action" largely did not carry over to the modified MPV Copy Website's map, which instead appears to feature an orange-on-white color scheme and no pins.  *Id.* ¶ 16; *id.* at 33 fig. 6.  Put simply, while the concept of mapping incidents of police killings is undoubtedly similar, the Court in many ways shares Campaign Zero's doubts over the proposition that the protectible aspects of the MPV Original Website's map are substantially similar to those in the modified MPV Copy Website's equivalent.

Nevertheless, that conclusion is not dispositive on the question of whether Counterclaim One survives dismissal.  First of all, the Amended Counterclaims' allegation that "Campaign Zero simply ripped off the public-facing contents of the MPV [Original] Website" seems to suggest that there was a period before Sinyangwe sent his letter in February 2022 when the map was more similar, if not identical, to the MPV Original Website's version thereof.  *Id.* ¶ 37.  More generally, and as noted above, the counterclaim is premised on the "selection, coordination, and arrangement of the [MPV] database, text, and graphics—*including* the signature map element," *id.* ¶ 47 (emphasis added), which tracks the Copyright Act's definition of a copyrightable compilation as

"a work formed by the collection and assembling of preexisting materials or of data that are *selected, coordinated, or arranged* in such a way that the resulting work as a whole constitutes an original work of authorship," 17 U.S.C. § 101 (emphasis added).  Here, as suggested by the use of the word "including" in Paragraph 47 of the Amended Counterclaims, the map is only one feature of the infringed work.  *Cf. Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation." (internal quotation marks omitted)).  Indeed, Campaign Zero appears to recognize as much, having advanced separate arguments attacking Defendants' "selection, coordination, and arrangement" theory.  *See* Motion at 9-10.  The Court turns to those arguments.

First, Campaign Zero argues that the Amended Counterclaims' allegation that "[n]o one at Campaign Zero understood how to replicate Mr. Sinyangwe's particular process for compiling the underlying database, so the content copied and displayed on the MPV Copy Website could not be updated prospectively in a way that would be consistent with the approach behind the original Mapping Police Violence project," undercuts Defendants' claim that Campaign Zero infringed the "selection, coordination, and arrangement" of the database.  Motion at 9 (quoting Am. Counterclaims ¶ 47).  This argument is unavailing.  As Defendants point out, "[t]he fact that Campaign Zero was unable to accurately update a database it had [allegedly] copied . . . does not mean that Campaign Zero did not copy the database in the first instance."  Opposition at 12.

Campaign Zero's other challenges fare no better.  Its argument that the police killings data constitute "basic facts" that are not copyrightable, Motion at 9; *see Abdin*, 971 F.3d at 67 ("[F]acts are not copyrightable." (quoting *Feist Publ'ns*, 499 U.S. at 344)), fails to take into account that Defendants' copyright claim concerns their "selection, coordination, and arrangement" of these facts, not the facts themselves, Am. Counterclaims ¶ 47.  Nor can the Court credit the notion that

16

Defendants "fail[] to allege how [Sinyangwe] selected or arranged police shooting data in an original and expressive way."  Motion at 10.  As noted above, the Amended Counterclaims explicitly allege that "Sinyangwe created every element of the project and website—including, for example, his particular selection, coordination, and arrangement of the database, accompanying text, custom color scheme, pin graphics, background, and visuals invoking a sense of danger, urgency, and a call to action—with the goal [of promoting meaningful change]."  Am. Counterclaims ¶ 16.  The Supreme Court has held in the context of compilations that "[o]riginality requires only that the author make the selection or arrangement independently (*i.e.*, without copying that selection or arrangement from another work), and that it display some minimal level of creativity.  Presumably, the vast majority of compilations will pass this test, but not all will." *Feist Publ'ns*, 499 U.S. at 358-59.

As alleged, the MPV Original Website surely passes that test.  Indeed, the Second Circuit has noted that "considerable skill and originality can be exercised by a mapmaker in the setting forth of unprotected information—in the selection or elimination of detail, the size, shape, and density of informative legends, the establishment of conventions relating to color or design to represent topographical or other features, and many other details of presentation."  *Sparaco v. Lawler, Matusky, Skelly Eng'rs LLP*, 303 F.3d 460, 467 (2d Cir. 2002).  The same principles apply here, given the Amended Counterclaims' allegations that Sinyangwe used color choices and picked certain graphics with a specific goal in mind.  Contrary to Campaign Zero's assertions, these choices were not "routine and obvious," nor does the fact that Sinyangwe aimed to provide a "comprehensive accounting of police violence" detract from his work's originality given the work's other unique features.  Motion at 10 (first quoting *Cantor v. NYP Holdings, Inc.*, 51 F. Supp. 2d 309, 314 (S.D.N.Y. 1999), then quoting Am. Counterclaims ¶ 2); *see Feist Publ'ns*, 499

17

U.S. at 362 ("[O]riginality is not a stringent standard; it does not require that facts be presented in an innovative or surprising way."). And, as Defendants point out, Opposition at 11-12, Campaign Zero's argument that Defendants "fail[] to allege that Campaign Zero copied any supposed selection and arrangement of the police shooting data" by pointing to the differences in the websites' maps, Motion at 10—a point that the Court generally credits at least as to the modified version of the MPV Copy Website map, as noted above—still fails to take into account the calendar graphic on which the Amended Counterclaims rely, *see* Am. Counterclaims 32 fig. 5.[5]  As noted above, the maps are only one element of the larger work Defendants allege was infringed, so similarities on that basis alone will not defeat the copyright infringement claim.

The Court therefore declines to dismiss Counterclaim One.

## B. Removal of Copyright Management Information

Campaign Zero next challenges Counterclaim Two, in which Defendants allege in relevant part that Campaign Zero violated the DMCA's prohibition on removing CMI by "intentionally and without Mr. Sinyangwe's authorization remov[ing] language from the MPV Copy Website identifying him as the creator of the Mapping Police Violence project and the contents of the MPV Website . . . to enable, facilitate, and conceal its plagiarism of the real MPV Website." *Id.* ¶¶ 54-55.  To make out a CMI removal or alteration claim under the DMCA, "[a] plaintiff must . . . prove the following: (1) the existence of CMI in connection with a copyrighted work; and (2) that a defendant 'distribute[d] . . . works [or] copies of works'; (3) while 'knowing that [CMI] has been removed or altered without authority of the copyright owner or the law'; and (4) while 'knowing,

---

[5] To be sure, Campaign Zero does advance calendar-based arguments in its reply brief, *see* Reply at 2, but "the Court will not consider arguments raised for the first time in a reply brief," *Nobel Ins. Co. v. City of New York*, No. 00 Civ. 1328 (KMK), 2006 WL 2848121, at *16 (S.D.N.Y. Sept. 29, 2006) (internal quotation marks and alterations omitted).

or . . . having reasonable grounds to know' that such distribution 'will induce, enable, facilitate, or conceal an infringement.'" *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 171 (2d Cir. 2020) (quoting 17 U.S.C. § 1202(b)).

Campaign Zero raises several challenges to Defendants' CMI removal claim, but only one is ultimately availing, although partially. First, Campaign Zero argues that Defendants "do[] not allege how [Sinyangwe's] name was supposedly referenced in connection with the 'project,' or the 'website,'" Motion at 11 (quoting Am. Counterclaims ¶ 40), but the Court can readily infer from the Amended Counterclaims that the relevant CMI for this counterclaim is the "map created by Samuel Sinyangwe" language that appeared alongside the map graphic. *See* Am. Counterclaims at 23 fig. 2, 26 fig. 4, 33 fig. 6; *see id.* ¶ 40 ("Campaign Zero removed from the MPV Copy Website language crediting Mr. Sinyangwe as the creator of the Mapping Police Violence project and the contents of the MPV Website."); *see generally* Opposition at 12 (listing figures with the map element in support of the proposition that "the [MPV Original Website] contained language identifying [Sinyangwe] as the creator and author of that work"), 13 (same), 14 ("Here, the CMI appeared on the very same MPV Website ripped off by Campaign Zero—in addition to being *directly next to the map element* . . . ." (emphasis added)). In addition, several arguments Campaign Zero makes are unpersuasive in light of the Court's prior analysis of the copyright infringement counterclaim, including that "th[e] map graphic . . . is . . . not protected by copyright," Motion at 12, and more generally that "Sinyangwe does not allege that Campaign Zero copied any copyrightable work from the [MPV Original Website]," *id.* at 14.

To be sure, Campaign Zero's argument that Defendants do not "identify any specific copyrightable work that bore his CMI and that Campaign Zero allegedly copied," Motion at 11, and that they "do[] not identify any copyrighted works . . . from which [Campaign Zero] allegedly

removed CMI," *id.* at 12, presents a closer call.  A number of courts throughout the country, including in this District, have concluded that "a party that puts its own CMI on work distinct from work owned by a copyright holder is not liable under Section 1202(a), even if the party's work incorporates the copyright holder's work."  *Michael Grecco Prods., Inc. v. Time USA, LLC*, No. 20 Civ. 4875 (NRB), 2021 WL 3192543, at *5 (S.D.N.Y. July 27, 2021); *see Design Basics, LLC v. WK Olson Architects, Inc.*, No. 17 Civ. 7432 (SLE), 2019 WL 527535, at *5 (N.D. Ill. Feb. 11, 2019) ("An action for removal of copyright management information requires the information to be removed from a plaintiff's product or original work." (quoting *Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010))).

The Honorable Richard J. Sullivan's analysis in *Park v. Skidmore, Owings & Merrill LLP* is especially compelling in that regard.  No. 17 Civ. 4473 (RJS), 2019 WL 9228987 (S.D.N.Y. Sept. 30, 2019).  There, an architect alleged that an architecture firm "infringed his copyright" in a skyscraper design titled Cityfront '99 for which he owned the copyright through the design of the skyscraper at One World Trade Center ("1 WTC") in Manhattan. *See id.* at *1-3.  The plaintiff also brought a cause of action under the DMCA for "convey[ing] . . . false [CMI]." *Id.* at *11. The court concluded that the firm "ha[d] not violated this provision by claiming authorship over 1 WTC, even if it is improperly derivative of [plaintiff's design]. . . .  [The firm] may have—at least as alleged by Plaintiff—infringed Plaintiff's copyright in Cityfront '99 during the creation of 1 WTC, but 1 WTC is unquestionably a distinct work from Cityfront '99; thus, [the firm] cannot violate the DMCA by associating its name with the building." *Id.* at *11.  In *Dominick R. Pilla, Architecture-Engineering P.C. v. Gilat*, the Honorable Kenneth M. Karas similarly concluded in the context of a case in which the architect plaintiff had been terminated from a building renovation project and alleged that the successor architect firm produced allegedly "substantially similar," but

not identical, drawings that "[e]ven if Defendants had improperly infringed upon Plaintiff's copyright by incorporating protected features into their redesign, Defendants 'did not violate the DMCA by printing [the firm's] name on the distinct products [plaintiff] had generated.'"  No. 19 Civ. 2255 (KMK), 2022 WL 1003852, at *26 (S.D.N.Y. Mar. 29, 2022) (quoting *Park*, 2019 WL 9228987, at *11).

That logic appears to require a distinction between the versions of the map on the MPV Copy Website before and after Campaign Zero made "minor modifications" thereto.  Am. Counterclaims ¶ 43.  The analysis for the modified map is more straightforward.  Whatever qualms Defendants or even the Court may have about copyright infringement, the fact remains that features of the MPV Original Website's map and the modified MPV Copy Website's map are distinct in all the ways detailed above.  *See supra* III.A.  At least with regard to the modified map, this is not a case where a defendant copied a plaintiff's work wholesale and simply removed the CMI.  *See Devocean Jewelry LLC v. Assoc. Newspapers Ltd.*, No. 16 Civ. 2150 (KMW), 2016 WL 6135662, at *2 (S.D.N.Y. Oct. 19, 2016).  Rather, as in *Park* and *Dominick R. Pilla*, Campaign Zero cannot plausibly be said to have removed CMI when the modified map graphic of the MPV Copy Website was distinct from that of the MPV Original Website.  That same logic also dispels Defendants' arguments that *Park* and cases like it are distinguishable because they involved "distinct work[s]."  Opposition at 16 (quoting *Park*, 2019 WL 9228987, at *11).  The Court therefore grants Campaign Zero's motion to dismiss Counterclaim Two inasmuch as the claim is predicated on the modified MPV Copy Website map.

However, the pre-modification version of the map presents a more complicated scenario.  As noted above, *see supra* III.A, the Court can infer from Amended Counterclaims that there was a more similar or even identical version of the map element on the MPV Copy Website between

the unspecified time in early 2022 when Campaign Zero "ripped off the public-facing contents of the MPV Website" and the point at which Campaign Zero made the "minor modifications" thereto. Am. Counterclaims ¶¶ 37, 43.  Campaign Zero's characterization of the Amended Counterclaims as alleging that they "populated [the MPV Copy Website] with new content" cannot be reconciled with Defendants' pre-modification allegations.  Opposition at 15 (quoting Motion at 12).  While Paragraph 37 of the Amended Counterclaims does not expressly allege that the initial version of the MPV Copy Website was *identical* to the MPV Original Website, the allegations allow for the inference that the two websites were at least close to identical, particularly given the allegations that the initial MPV Copy Website was a "copycat version" that "ripped off" the MPV Original Website, as well as that Campaign Zero "us[ed] Mr. Sinyangwe's original content copied from the MPV [Original] Website."  Am. Counterclaims ¶ 37.  Given these allegations, the logic of *Park*— where the defendant allegedly created "unquestionably a distinct work"—does not apply to the pre-modification version of the MPV Copy Website.

Instead, the Amended Counterclaims' allegations suggest that Campaign Zero simply "ripped off" the map element as it existed on the Original MPV Website in early 2022 and "removed . . . language crediting Mr. Sinyangwe as the creator of the [MPV] project and the elements of the MPV Website," *id.* ¶¶ 37, 40, which are more akin to scenarios in which courts in this District have sustained DMCA claims.  *See, e.g.*, *Patterson v. Diggs*, No. 18 Civ. 3142 (NSR), 2019 WL 3996493, at *4 (S.D.N.Y. Aug. 23, 2019) (holding that the plaintiff's allegation that "Defendants, without authorization, 'intentionally remov[ed] and/or alter[ed] the copyright information, in the form of metadata, on the copy of at least Plaintiff's copyrighted photograph'" was "somewhat sparse . . . [but] sufficient" to allege a DMCA claim when the plaintiff also "support[ed] his complaint with an exhibit purporting to show the alleged metadata included in

one photograph" of his (first and second alterations in original)); *Devocean Jewelry*, 2016 WL 6135662, at *2 (sustaining a DMCA claim when the plaintiff "alleg[ed] that Defendant removed the CMI from [video s]creen [g]rabs" taken directly from a video for which the plaintiff was the copyright owner).  At this motion to dismiss stage, where the allegations in the Counterclaims must be taken as true with all reasonable inferences drawn in Defendants' favor, these allegations are sufficient.  The Court will thus allow Counterclaim Two to proceed, albeit only on the basis of the pre-modification version of the MPV Copy Website.

### C. Cyberpiracy

Counterclaim Seven for cyberpiracy essentially alleges that Campaign Zero's "publish[ing] a copycat version [of the MPV Original Website] on the domain mappingpoliceviolence.org" constituted an "attempt to continue profiting from the considerable benefits of [the MPV Copy Website's] association with Mr. Sinyangwe's work."  Am. Counterclaims ¶ 37; *see id.* ¶¶ 81-85.  Defendants more specifically allege that "Campaign Zero has re-registered the mappingpoliceviolence.org domain at least once to maintain the MPV Copy Website and to facilitate its wrongdoing" and that "Campaign Zero . . . set up the MPV Copy Website to divert to Campaign Zero visitor donations intended to support the Mapping Police Violence project, and so that email addresses of visitors who subscribed through the MPV Copy Website would be added to Campaign Zero's audience list for marketing purposes."  *Id.* ¶¶ 38, 40.

"The [ACPA], 15 U.S.C. § 1125(d), was enacted in 1999 to protect consumers and holders of distinctive trademarks from 'cybersquatting,' which 'involves the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners.'"  *Webadviso v. Bank of Am. Corp.*, 448 F. App'x 95, 97 (2d Cir. 2011) (quoting *Sporty's Farms L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000)).  "To

successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark." *Id.* (citing 15 U.S.C. § 1125(d)(1)(a)).

Campaign Zero mounts challenges to the first and third prongs of the Second Circuit's ACPA test in moving to dismiss Counterclaim Seven.  The Court addresses these arguments in turn.

### 1.    Registration

As for the first prong, Campaign Zero objects to Defendants' reliance on its re-registration of the mappingpoliceviolence.org domain in March 2023 for their ACPA claim, as opposed to McKesson's initial registration in March 2015.  Opposition at 18-20; *see* Am. Counterclaims ¶¶ 19 (2015 registration), 38 (2023 re-registration), 83 (ACPA claim relying on 2023 re-registration). The statute provides in relevant part that "[a] person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person . . . (ii) registers, traffics in, or uses a domain name that . . . (I) in the case of a mark that is *distinctive at the time of registration* of the domain name, is identical or confusingly similar to that mark."  15 U.S.C. § 1125(d)(1)(A) (emphasis added).  Campaign Zero contends that "[t]he ACPA looks to whether the claimant's mark is distinctive at the time the allegedly infringing domain was registered, not when the registration is later renewed."  Motion at 17.  To that end, the crucial difference between the March 2015 registration and the March 2023 re-registration is that, per the Amended Counterclaims, "[a]s a result of Mr. Sinyangwe's work, the name 'Mapping Police Violence' acquired distinctiveness between March 2015 and 2021."  Am. Counterclaims ¶ 27.  Thus, Defendants essentially acknowledge that MPV was not distinctive at the time of the initial March 2015 registration.

As both parties note, Campaign Zero's argument implicates a circuit split over the meaning of registration under the ACPA and more specifically over whether a re-registration falls within the meaning of that term.  *See* Motion at 17-19; Opposition at 18-20.  The statute does not define the term "registration," nor does the Second Circuit appear to have weighed in on this question. In that absence, the Third, Fourth, and Eleventh Circuits have all concluded that—as the Fourth Circuit summarized:

> To "re-register" simply means "to register again." . . .  Therefore, the ordinary meaning of the word "registers" necessarily includes both the first registration and any subsequent re-registrations.  And because the ACPA does not expressly limit the term registers to only the initial or creation registration, . . . the re-registration of a domain name is a registration for purposes of the ACPA.

*Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*, 58 F.4th 785, 796 (4th Cir. 2023) (quoting *Re-register*, Merriam-Webster Dictionary (11th ed. 2022)); *see also Schmidheiny v. Weber*, 319 F.3d 581, 583 (3d Cir. 2003) ("[W]e conclude that the language of the statute does not limit the word 'registration' to the narrow concept of 'creation registration.'"); *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 778 (11th Cir. 2015) ("We . . . will not read additional words into the statute such as initial or creation. The plain meaning of register includes a re-registration.").  In contrast, the Ninth Circuit has held that, "[l]ooking at ACPA in light of traditional property law, . . . Congress meant 'registration' to refer only to the initial registration." *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1031 (9th Cir. 2011).[6]

---

[6] It bears mention that the Third Circuit's decision in *Schmidheiny* implicated another ACPA provision that was codified at 15 U.S.C. § 1129 and that has since been transferred to 15 U.S.C. § 8131.  *See Schmidheiny*, 319 F.3d at 582; 15 U.S.C. § 1129 (noting that the provision was transferred to Section 8131).  That provision establishes civil liability for "[a]ny person who registers a domain name that consists of the name of another living person, or a name substantially and confusingly similar thereto, without that person's consent, with the specific intent to profit from such name by selling the domain name for financial gain to that person or any third party." 15 U.S.C. § 8131(1)(A).  Nevertheless, each of the circuits to have subsequently considered the

The Court concludes that the former three circuits have the better of the argument. When a term "is not defined in [a] statute, . . . we give the term its ordinary meaning," *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1140 (2018), and "[i]t is not the province of the courts to add words to statutes that Congress has enacted," *Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 331 (2d Cir. 2022). Had Congress wished to restrict the word "registration" as used in the ACPA to initial registrations, it surely knew how to do so.

Campaign Zero's arguments to the contrary fail to persuade. Campaign Zero argues that the Fourth and Eleventh Circuit's holdings constituted *dicta*, Motion at 18-19, but those courts' language quoted above makes clear that that is not the case. Campaign Zero also contends that the Fourth Circuit's language in *Prudential* that "[w]hen a person re-registers a domain name because of a periodic re-registration requirement, they do not act with a bad faith intent to profit," 58 F.4th at 797, the lack of "allegations that Campaign Zero sought to extort Sinyangwe by offering to sell the MappingPoliceViolence.org domain to him or anyone else" in relation to *Jysk Ben'N Linen*, and the absence of a "new contract at a different registrar, or any change of the registrant" in relation to *Schmidheiny* all undercut Defendants' ACPA claim. Motion at 18-19. However, as discussed below, *see infra* III.C.2, Defendants have plausibly alleged bad faith intent to profit. More importantly, for whatever factual distinctions may exist between this case and the circuit decisions cited above, the import of their holdings is that the March 2023 re-registration suffices as a basis for Defendants' cyberpiracy counterclaim, particularly given that Campaign Zero does not appear to contest that the MPV mark had acquired distinctiveness by that point. The Court

---

re-registration question in the context of Section 1125(d)(1) has analyzed the Third Circuit's decision in *Schmidheiny*, perhaps in recognition of the fact that these two provisions are both "part of the ACPA[] and . . . are so strikingly similar." *Bogoni v. Gomez*, 847 F. Supp. 2d 519, 524 (S.D.N.Y. 2012); *see Prudential Ins. Co. of Am.*, 58 F.4th at 794-95; *Jysk Bed'N Linen*, 810 F.3d at 777; *GoPets*, 657 F.3d at 1031.

thus will not dismiss Defendants' ACPA counterclaim based on Defendants' reliance on the website's re-registration.[7]

### 2.     Bad Faith Intent to Profit

Campaign Zero also contends that Defendants have failed to adequately plead its bad faith intent to profit.  Motion at 20-24.  The Second Circuit has held that "'bad faith intent to profit' [is a] term[] of art in the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts."  *Sporty's Farm*, 202 F.3d at 499 n.13.  The ACPA "lists nine factors to assist courts in determining when a defendant has acted with a bad faith intent to profit from the use of a mark[,] [although courts] are not limited to considering just the listed factors when making [the] determination of whether the statutory criterion has been met."  *Id.* at 498.  These factors are:

(I)     the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)     the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)     the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)     the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)     the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

---

[7] Campaign Zero also argues in its reply brief that Defendants "ha[ve] not alleged . . . that Campaign Zero 'registered' a domain name corresponding to a mark that was distinctive at the time" because "the domain lookup website that Sinyangwe incorporates into his pleading shows that Campaign Zero merely 'Updated' its registration in March 2023."  Reply at 9 (citing Am. Counterclaims at 30 n.1).  However, as was already noted, *supra* n.5, the Court will not consider arguments made for the first time in a reply brief.

(VI)    the person's offer to transfer, sell, or otherwise assign the domain name to
        the mark owner or any third party for financial gain without having used, or
        having an intent to use, the domain name in the bona fide offering of any
        goods or services, or the person's prior conduct indicating a pattern of such
        conduct;

(VII)   the person's provision of material and misleading false contact information
        when applying for the registration of the domain name, the person's
        intentional failure to maintain accurate contact information, or the person's
        prior conduct indicating a pattern of such conduct;

(VIII)  the person's registration or acquisition of multiple domain names which the
        person knows are identical or confusingly similar to marks of others that are
        distinctive at the time of registration of such domain names, or dilutive of
        famous marks of others that are famous at the time of registration of such
        domain names, without regard to the goods or services of the parties; and

(IX)    the extent to which the mark incorporated in the person's domain name
        registration is or is not distinctive and famous within the meaning of
        subsection (c).

15 U.S.C. § 1125(d)(1)(B)(i).  Some courts have explained that the "first four factors suggest

circumstances tending to indicate an absence of bad faith intent to profit from the goodwill of the

mark, while the next four tend to indicate that such bad faith does exist and the last factor points

in either direction, depending on the degree of distinctiveness and fame of the mark."  *Row, Inc.

v. Highgate Hotels, L.P.*, No. 15 Civ. 4419 (JFK), 2018 WL 3756456, at *4 (S.D.N.Y. July 19,

2018) (internal quotation marks omitted).

        As the parties appear to acknowledge, Defendants' cyberpiracy allegations do not map

neatly onto the nine statutory factors.  The parties appear to agree that several of the statutory

factors are simply not at issue in this case; indeed, Defendants concede that only the first, fourth,

fifth, and ninth factors ostensibly "decisively support a finding of bad faith, while the other factors

are inapplicable or neutral."  Opposition at 23; *see* Motion at 21-22.  Campaign Zero raises several

arguments related to these factors.  As to the first factor, Campaign Zero points to the fact that

"Sinyangwe alleges that he collaborated with Campaign Zero to use the MPV mark, giving

Campaign Zero at least colorable rights in the MappingPoliceViolence.org domain name."  Motion at 21.   Campaign Zero further argues that the fourth factor is undermined by "Sinyangwe admit[ting] that Campaign Zero used the MPV mark for the *bona fide* provision of public interest information for more than six years" and, as to the fifth factor, that "there are no allegations that Campaign Zero intended to divert donors from the Squarespace MPV Website, as it used the MappingPoliceViolence.org domain to further its legitimate police reform initiatives."  *Id.*

These arguments are largely unavailing.  As Defendants point out, the crux of their cyberpiracy counterclaim is of course not based on Campaign Zero's collaboration with Sinyangwe "before he left the organization in 2021, but [rather] . . . [the alleged] later bad faith at the time that Campaign Zero re-registered the [MPV] domain" after Sinyangwe left Campaign Zero.  Opposition at 20-21.   At least in terms of the first factor, drawing all inferences in Defendants' favor—as the Court must at this stage—the Amended Counterclaims suggest that Campaign Zero likely knew by the time it set up the MPV Copy Website that it lacked intellectual property rights to the MPV Original Website and, by extension, the MPV domain name.  After all, Defendants allege that it was only after Campaign Zero failed to get Sinyangwe to "assign[ his] intellectual property" to them and—perhaps more importantly—"without Mr. Sinyangwe's knowledge or permission, [unsuccessfully] attempted to gain access to Mr. Sinyangwe's account" that Campaign Zero resorted to setting up the MPV Copy Website.  Am. Counterclaims ¶¶ 33, 36.  While Campaign Zero avers that "[a]t most, Sinyangwe's pleading shows that there is a dispute over ownership of the MPV mark," Motion at 20, the Court concludes that the most plausible

reading of the Amended Counterclaims is rather that Campaign Zero only pursued the MPV Copy Website strategy after it became clear to it that it lacked rights to the MPV mark.[8]

In addition, contrary to Campaign Zero's argument in relation to the fifth factor that "there are no allegations that Campaign Zero intended to divert donors from the Squarespace MPV Website," Motion at 21, the Amended Counterclaims specifically allege that "Campaign Zero also set up the MPV Copy Website to divert to Campaign Zero visitor donations intended to support the Mapping Police Violence project," Am. Counterclaims ¶ 40, a feat Campaign Zero presumably achieved by generally diverting traffic from the MPV Original Website to the MPV Copy Website. To that end, Campaign Zero also appears to argue that the Amended Counterclaims' allegation of donation diversion cannot sustain an ACPA bad faith finding because "Campaign Zero's solicitation of donations . . . support[s] its legitimate non-profit work." Motion at 22. To the extent that Campaign Zero meant this argument to refer to the ACPA's language of "bad faith intent *to profit*," the Court is unpersuaded. "Courts . . . have interpreted the meaning of 'profit' in the ACPA broadly." *McAllister Olivarius v. Mermel*, 298 F. Supp. 3d 661, 675 (S.D.N.Y. 2018).

---

[8] To be sure, the Amended Counterclaims do allege that "McKesson purchased the domain mappingpoliceviolence.org" in 2015. Am. Counterclaims ¶ 19. However, as the Fourth Circuit has noted, the "mere fact" of domain name ownership "is irrelevant [to the first bad faith factor of intellectual property rights] because if registration of a domain name itself established a qualifying right, then factor one would favor the cybersquatter in every case." *Prudential Ins. Co. of Am.*, 58 F.4th at 799. And it also bears recalling that the Amended Counterclaims specifically allege that "[n]o other individual affiliated with Campaign Zero, including the other co-founders, ever directed, supervised, or otherwise exercised any control or authority over Mr. Sinyangwe's work on the Mapping Police Violence project or its related initiatives" and that "Mr. Sinyangwe never conveyed his ownership interest in his original work or assigned his intellectual-property rights to Campaign Zero, even when Campaign Zero explicitly asked him to do so years later in 2021." Am. Counterclaims ¶¶ 25-26; *see also id.* ¶ 34 ("Campaign Zero had been content to reap the considerable benefits of its affiliation with the Mapping Police Violence project and its related initiatives—including public visibility, credibility, other reputational benefits, and millions of dollars in donations—but had made no meaningful effort over the years to contribute to Mr. Sinyangwe's work . . . .").

In particular, the Eighth Circuit sustained an ACPA bad faith finding where the defendant rerouted visitors to domain names incorporating famous marks "to a website where a visitor can . . . make donations [in that case, to antiabortion groups] using a credit card or bank account number." *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 779 (8th Cir. 2004).  In discussing the fourth factor of "bona fide noncommercial or fair use of the mark," the Eighth Circuit held that "[t]hese websites can[]not be considered to be completely noncommercial since they directly solicited monetary contributions and offered various antiabortion merchandise for sale. . . .  Such use of the domain names would apparently profit the organizations of [the defendant]'s choice." *Id.* at 786.  Applying that logic, the fact that the diverted donations supported Campaign Zero's non-profit work is of no moment— the donations still helped Campaign Zero to profit as that term is construed under the ACPA. Indeed, the donation-diversion allegations in the Amended Counterclaims are plainly different from mere allegations that "web customers are being driven to defendant's website because of the defendant's trademark infringement[, which] do[es] not state a cybersquatting claim absent any allegation that defendant intended to divert business from any site the plaintiff maintains." *Curated Works Inc. v. Deal.com, Inc.*, No. 19 Civ. 11509 (LAK) (GWG), 2020 WL 2375079, at *6 (S.D.N.Y. May 12, 2020) (Report and Recommendation) (internal quotation marks and alterations omitted).

To be sure, Campaign Zero's apparently uncontested prior "affiliation with the Mapping Violence Project and its related initiatives" may counsel against a finding of bad faith intent to profit in relation to the third factor of prior use.  Am. Counterclaims ¶ 34.  Yet "[n]one of the factors is individually dispositive," *Prudential Ins. Co. of Am.*, 58 F.4th at 798, and, more generally, "[c]ourts need not march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive," *Am. Lecithin Co. v. Rebmann*, No. 12 Civ. 929

(VSB), 2020 WL 4260989, at *8 (S.D.N.Y. July 24, 2020) (internal quotation marks and alterations omitted).   On that note, Campaign Zero's conduct as alleged in the Amened Counterclaims is close to a "quintessential example" of bad faith under the ACPA; namely, "where a defendant 'intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's." *Gioconda Law Grp. PLLC v. Kenzie*, 941 F. Supp. 2d 424, 434 (S.D.N.Y. 2013) (alteration in original) (quoting *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Res.*, 527 F.3d 1045, 1058 (10th Cir. 2008)); *see id.* at 433 ("[A] number of courts—including the Second Circuit—have departed from strict adherence to the statutory indicia and relied expressly on a more case-specific approach to bad faith. . . .  That inquiry must be guided by an assessment of how close a defendant's conduct falls to the ACPA's heartland." (citing, *inter alia*, *Sporty's Farm*, 202 F.3d at 499)).

Ultimately, the Amended Counterclaims allege that Campaign Zero created the MPV Copy Website "in order to plagiarize and to benefit from the reputation and credibility of Mr. Sinyangwe's work on the Mapping Police Violence project," Am. Counterclaims ¶ 83, going so far as to set up the website in such a way as to divert donations intended for the original and also doing so in a way that enabled them to add subscribers to Campaign Zero's marketing list, *id.* ¶ 40. As in *Sporty's Farm*, as alleged, Campaign Zero was "fully aware that [MPV] was a . . . strong mark" and its attempt to divert donations and other resources capitalized on that goodwill.  202 F.3d at 499; *contra Row*, 2018 WL 3756456, at *5 ("The amended complaint makes no allegation that [the defendant] intended to divert consumers from Plaintiff's site to theirs for commercial gain or with intent to tarnish or disparage the mark through creating a likelihood of confusion . . . ."). Therefore, even with a majority of the statutory factors inapposite as Defendants concede, "the

unique circumstances of this case" militate toward the conclusion that Defendants have adequately pleaded Campaign Zero's bad faith intent to profit at this early stage of litigation. *Sporty's Farm*, 202 F.3d at 499.

The Court therefore declines to dismiss Counterclaim Seven.

## IV.  Leave to Amend

Lastly, the Court grants Defendants' request for leave to amend. *See* Opposition at 24-25. Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Court will grant Defendants leave to file second amended counterclaims, in the event that they believe that they can plead facts related to the deficiencies identified above as to Counterclaim Two that would adequately state a claim upon which relief may be granted.  Campaign Zero would not be unduly prejudiced by an amendment and is on notice as to the basic circumstances underlying this counterclaim.  The Court emphasizes, however, that Defendants should amend only if they are able to resolve the pleading deficiencies outlined in this Opinion and Order.

## V.  Conclusion

For the foregoing reasons, the Court grants Campaign Zero's motion in part and denies it in part.  The Court further denies Defendants' request for oral argument as moot.  If Defendants choose to file second amended counterclaims, they must do so within thirty days of the issuance of this Opinion and Order.  The Clerk of Court is respectfully directed to close the motion at Docket Number 34.

SO ORDERED.

Dated: March 20, 2024
       New York, New York

_____
JOHN P. CRONAN
United States District Judge

33