**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
WE THE PROTESTERS, INC., d/b/a
CAMPAIGN ZERO, a Delaware
Nonprofit Corporation, and STAY
WOKE, INC., a Delaware Nonprofit
Corporation,

                                Plaintiffs,           **22 Civ. 9565 (JPC) (GS)**

        -against-                              **OPINION & ORDER**

SAMUEL SINYANGWE and
MAPPING POLICE VIOLENCE,
INC., a California Nonprofit
Corporation,

                                Defendants.
------------------------------------------------------------------X

**GARY STEIN, United States Magistrate Judge:**

      Before the Court is a discovery dispute that underscores the importance of counsel fashioning clear and comprehensive agreements when navigating the perils and pitfalls of electronic discovery. Without having an express agreement in place to do so, Plaintiffs-Counterclaim Defendants We the Protesters, Inc., d/b/a Campaign Zero ("Campaign Zero"), and Stay Woke, Inc. (together, "Plaintiffs") redacted certain text messages from their document production. Defendants-Counterclaim Plaintiffs Samuel Sinyangwe and Mapping Police Violence, Inc. ("MPVI") (together, "Defendants"), who produced their text messages in unredacted form, now move to compel Plaintiffs to do likewise. (Dkt. No. 64).

      For the reasons set forth below, Defendants' motion is **GRANTED** subject to a meet-and-confer obligation with respect to a subset of text messages.

## BACKGROUND

This litigation arises from an acrimonious breakup involving the founders of a nonprofit organization, Campaign Zero, formed to educate the public about police violence through data-driven analysis and to advocate for police reform. (Dkt. No. 1 (Complaint) ¶ 9). Social justice activists DeRay McKesson and Defendant Samuel Sinyangwe, together with others, launched Campaign Zero in 2015. (*Id.* ¶¶ 9, 18-24). The organization's Mapping Police Violence website gained widespread recognition as a reliable source of data regarding policing in the United States. (*Id.* ¶ 37). But by 2021, deep-seated disagreements emerged that led to Sinyangwe's departure, clashes over control of the organization's intellectual property, and eventually the filing of this lawsuit in November 2022. (*Id.* ¶¶ 4-8, 65-67).

Plaintiffs seek to hold Defendants liable for Sinyangwe's "wrongfully seizing control of Campaign Zero's valuable internet domains, stealing charitable donations intended for Campaign Zero, and falsely claiming to be affiliated with Campaign Zero's social justice initiatives long after he left the organization, in order to financially benefit himself and ventures unaffiliated with Campaign Zero." (*Id.* ¶ 1). Plaintiffs' Complaint asserts seventeen causes of action for, *inter alia*, trademark infringement, unfair competition, misappropriation, and conversion. (*Id.* ¶¶ 107-98).

Defendants have counterclaimed, accusing Plaintiffs of, *inter alia*, copyright infringement, trademark infringement, cyberpiracy, and unfair competition. (Dkt. No. 32 (Defendants' Answer and Amended Counterclaims) ¶¶ 45-115). According to

Defendants, it was Campaign Zero that wrongfully tried to take the Mapping Police Violence project from Sinyangwe, "ripp[ing] off the [project's] public-facing website" and "set[ting] up a copycat website" in "a brazen act of plagiarism" in order to "rake in donations, subscriptions, partnerships, sponsorships, web traffic and other financial and reputational benefits." (*Id.* ¶¶ 4-5).

In March 2024, the Honorable John P. Cronan granted in part and denied in part Plaintiffs' motion to dismiss three of Defendants' counterclaims. (Dkt. No. 42, reported at *We the Protesters, Inc. v. Sinyangwe*, 724 F. Supp. 3d 281 (S.D.N.Y. 2024)). Following an Initial Case Management Conference on May 2, 2024 before the undersigned, to whom the case has been referred for general pretrial supervision (Dkt. No. 43 and Dkt. Entry dated March 21, 2024), the case proceeded to discovery (*see* Dkt. No. 49).

The current discovery dispute came to light after the parties exchanged productions of text messages and Twitter direct messages on October 25, 2024. (Dkt. No. 64 at 2; Dkt. No. 68 (Transcript of Dec. 6, 2024 Conference ("Tr.")) at 5:14-15, 7:2-3). The two sides had agreed to collect and review all text messages in the same chain on the same day whenever there was a text message within the chain that hit on one of the agreed-upon search term. (Dkt. No. 64 at 1 & Ex. A). Unlike Defendants, Plaintiffs understood that they only needed to produce messages from the same-day period that were responsive or provided context for a responsive text message. (*Id.* at 2 & Ex. B). Upon reviewing Plaintiffs' production, Defendants objected and claimed that Plaintiffs' unilateral redaction of text

3

messages within a same-day text chain was improper. (Dkt. No. 64 at 2-3; Dkt. No. 64-2).

Following an unsuccessful meet and confer, Defendants filed a letter-motion on November 8, 2024 seeking to compel Plaintiffs to produce unredacted copies of all text messages in the same chain that were sent or received within the same day. (Dkt. No. 64 at 3). Plaintiffs responded by letter on November 13, 2024, contending that their redactions were proper and, in the alternative, seeking a protective order. (Dkt. No. 66 at 3). The Court held a discovery conference on December 6, 2024.

## DISCUSSION

### A. Treatment of Text Messages in Discovery

Text messages are an increasingly common source of relevant and often critical evidence in twenty-first century litigation.[1] They do not, however, fit neatly into the paradigms for document discovery embodied by Rule 34 of the Federal Rules of Civil Procedure, which was crafted with different modes of communication in mind. Although Rule 34 was updated in 2006 to acknowledge expressly the existence of "electronically stored information" ("ESI") as distinct from hard-copy "documents," *see* Fed. R. Civ. P. 34, 2006 Advisory Comm. Note, the dominant form

---

[1] Mobile phone users in the United States sent an estimated 2 trillion SMS and MMS messages in 2021, or roughly 5.5 billion messages per day, a twenty-five-fold increase from 2005. Statista, *Total number of SMS and MMS messages sent in the United States from 2005 to 2021*, available at www.statista.com/statistics/185879/number-of-text-messages-in-the-united-states-since-2005/ (last visited Dec. 17, 2024). SMS and MMS messages represent only a subset of the universe of mobile instant messaging, or MIM, which also includes platforms such as WhatsApp, Twitter DM, and other means of messaging via mobile phones. MIM, in turn, does not account for the vast volume of instant messages, or IM, sent on computer-mediated communication platforms such as Microsoft Teams, Slack, Google Workspace, and the like. The use of IM and MIM "has become an integral part of work since COVID-19." Katrina Paerata, *The Use of Workplace Instant Messaging Since COVID-19*, Telematics and Informatics Reports (May 2023).

of ESI at the time by far was electronic mail ("email"). Email at least retains a resemblance to conventional documents in that each email or email chain can be viewed as a single, identifiable "document."

With text messages this is not so clear. For discovery purposes, should each text message be viewed as its own stand-alone "document" or item of ESI? Or is the relevant "document" the entire *chain* of text messages between the custodian and the other individual or individuals on the chain—which could embrace hundreds or thousands of messages going back for years? Should the producing party be allowed to redact non-responsive texts and, if so, to what extent? Litigants, and courts, are still in the process of figuring out how to answer these questions.[2]

"Federal courts have adopted different approaches with respect to text messages." *Lubrizol Corp. v. IBM Corp.*, No. 1:21-CV-870-DAR, 2023 WL 3453643, at *3 (N.D. Ohio May 15, 2023). Some courts have suggested that "a party must produce the entirety of a text message conversation that contains at least some responsive messages." *Id.* (citing cases). This is the approach taken in the leading case on the issue in this District, *Al Thani v. Hanke*, No. 20 Civ. 4765 (JPC), 2022 WL 1684271 (S.D.N.Y. May 26, 2022).

---

[2] Plaintiffs' counsel articulated a salient distinction between email and text messages at the December 6 conference, noting that, on the one hand, "usually people will keep [an] email chain on the same topic," whereas on the other hand text messages are "very different" because "it's just one stream of communications between individuals about any and all topics." (Tr. at 27:11-24). This is particularly true, Plaintiffs' counsel contended, of millennials (the generation to which Campaign Zero's founders belong), who "are texting about innumerable subjects within a short period of time" in what is "basically a stream of consciousness." (*Id.* at 15:13-19).

In *Al Thani*, Judge Cronan applied, in the context of text messages, the general rule restricting a producing party from redacting unrelated, nonprivileged information from an otherwise responsive document. Finding "no reason to go against the weight of authority in this Circuit, which holds that parties may not unilaterally redact otherwise discoverable documents for reasons other than privilege," *id.* at *2, the *Al Thani* court ordered the defendant there to produce "the unredacted text messages" between herself and another defendant "in their entirety." *Id.* at *3; *see also Vinci Brands LLC v. Coach Servs., Inc.*, No. 23 Civ. 5138 (LGS), Dkt. No. 347 (S.D.N.Y. Apr. 30, 2024) (following *Al Thani*).

By contrast, some courts in other jurisdictions have held that "the producing party can unilaterally withhold portions of a text message chain that are not relevant to the case." *Lubrizol*, 2023 WL 3453643, at *4 (citing cases). "Still other courts have taken a middle ground." *Id.* (citing cases). In *Lubrizol*, which involved a dispute concerning Slack instant messages (which the court analogized to text messages), the court approved plaintiff's proposal that, for any Slack conversation containing more than 20 total messages, the defendant be required to produce the ten text messages immediately preceding, and the ten messages immediately following, any responsive text message. *Id.* at *1, *4.

Litigants are free to—and are well-advised to—mitigate the risk of this uncertain legal regime by coming to their own agreement about how to address text messages in discovery. Rule 29(b) specifically affords parties the flexibility to design their own, mutually agreed upon protocols for handling discovery. *See* Fed.

R. Civ. P. 29(b) & 1993 Adv. Comm. Note (Rule 29(b) designed to "give greater opportunity for litigants to agree upon modifications to the procedures governing discovery or to limitations upon discovery"). Rule 29(b) not only permits, but "encourage[s]" counsel "to agree on less expensive and time-consuming methods to obtain information." *Id.* 1993 Adv. Comm. Note. Such "'private ordering of civil discovery'" is "'critical to maintaining an orderly federal system'" and "'it is no exaggeration to say that the federal trial courts otherwise would be hopefully awash.'" *Brown v. Hearst Corp.*, No. 3:14-cv-1220-VLB, 2015 WL 5923541, at *1 (D. Conn. Oct. 9, 2015) (quoting 6 *Moore's Federal Practice* § 26.101(1)(a))).

In the context of text messages, an agreed-upon protocol is particularly sensible where, as here, both sides are seeking and will be producing such information. A party may think twice about insisting on the most burdensome and costly method of reviewing and producing text messages for its adversary if it knows it will be subject to the same burden and cost. Similarly, when it comes to redactions, while a party may be happy to receive unredacted messages from the other side, it may forgo that potential benefit if that allows it to redact information from its own production. In general, the parties are better positioned than the court to customize a discovery protocol that suits the needs of the case given their greater familiarity with the facts, the likely significance of text message evidence, and the anticipated volume and costs of the discovery. *See generally* Jessica Erickson, *Bespoke Discovery*, 71 Vand. L. Rev. 1873, 1906 (2018) ("Parties should have more

information than judges about the specific nature of their disputes and thus should be in a better position to predict the types of restrictions that will be appropriate.").

## B. The Parties' Agreement With Respect to Text Messages

Evidently recognizing the benefits of such an approach, Plaintiffs and Defendants in this case negotiated an agreement with respect to the treatment of text messages in discovery. Unfortunately, their agreement was less than complete.

As shown by emails between counsel provided on this motion, the parties engaged in discussions in June 2024 surrounding the production of text messages as well as emails and other electronic evidence. (Dkt. No. 64-1). Counsel for Plaintiffs ultimately sent an email stating: "We are amenable to reviewing all texts in the same chain sent or received on the same day as any text that hits on any of the search terms. Please confirm whether [Defendants] are prepared to do the same." (*Id.* at 3). Counsel for Defendants replied: "Confirmed." (*Id.*).

That email exchange, along with the parties' summary of the verbal discussions that took place around the same time, evince agreement that: (1) discovery in the case would encompass text messages; (2) agreed-upon search terms would be used to identify potentially responsive text messages; and (3) any time a search term hit on a text message, counsel would review all messages in the same chain sent or received the same day, regardless of whether the initial text message that hit on the search term was responsive and relevant. (Dkt. No. 64 at 1-2; Dkt. No. 64-1 at 3; Dkt. No. 66 at 1-2; Tr. at 19:22-20:23; 29:9-23). The parties then both produced responsive and relevant text messages in the form of same-day text

8

chains, manifesting mutual assent that a same-day chain represented the appropriate unit of production. (Dkt. No. 66 at 2; Tr. at 19:6-15).

What the parties' agreement did *not* explicitly address is whether, in producing those same-day text chains, texts deemed irrelevant and non-responsive would be redacted or, instead, the chains needed to be produced in their entirety. Defendants understood that if the same-day period included any responsive and relevant messages, the same-day chain would be produced in its entirety without redacting non-responsive or irrelevant information. (Dkt. No. 64-2 at 5; Tr. at 23:5-7). Plaintiffs understood the same-day period to define the scope of *review*, but not the scope of *production*, such that non-responsive or irrelevant messages included in a same-day text chain need not be produced and could be redacted. (Dkt. No. 64-2 at 3; Dkt. No. 66 at 2; Tr. at 8:7-24, 24:8-16, 29:12-22).

The parties subsequently exchanged productions in accordance with these very different understandings. Although Plaintiffs produced 679 same-day text chains in full without any redactions, Plaintiffs made redactions in another 1,015 same-day text chains, redacting tens of thousands of individual messages. (Dkt. No. 66 at 2). The precise number of same-day text chains produced by Defendants is not in the record before the Court, but defense counsel estimated it to be "in the hundreds." (Tr. at 33:3-4).

One might think that, before producing hundreds of unredacted text chains in their entirety (in the case of Defendants), or before going to the trouble and expense of redacting tens of thousands of messages from more than a thousand text

9

chains (in the case of Plaintiffs), counsel would have contacted its adversary to confirm that the other side was handling their production in the same manner. Such an inquiry would have flushed out the parties' disparate understandings and led to additional negotiations and, perhaps, an agreement on the redaction issue. But neither counsel called or emailed (or texted) its adversary to engage in that discussion. (*See* Tr. at 13:7-21, 21:12-21).

That failure to communicate has now spawned the instant discovery dispute.

### C. Resolution

To resolve this dispute, it is important to view it through the prism of the parties' prior agreement and discussions (and lack of discussions). As the Court perceives it, its task on this motion is not to determine what the "right answer" to the redaction question is in the abstract. That would be the case if the parties had identified their different positions prior to production, unsuccessfully met and conferred, and brought the dispute to the Court for resolution. But that is not what the parties did; rather, they proceeded to perform their agreement without realizing it was incomplete. The Court's task on this motion is thus more akin to filling a gap in the parties' incomplete agreement. *See In re World Trade Center Disaster Site Litig.*, 754 F.3d 114, 122 (2d Cir. 2014) ("In limited circumstances, a court may supply a missing term in a contract."); *Adler v. Payward, Inc.*, 827 F. App'x 133, 135 (2d Cir. 2020) ("[C]ourts should supply reasonable terms to fill gaps in incomplete contracts.") (citation omitted).

It is a familiar principle of contract law that "contracting parties operate against the backdrop" of applicable law. *Hugo Boss Fashions, Inc. v. Federal Ins. Co.*, 252 F.3d 608, 618 (2d Cir. 2001). Here, the applicable background law is supplied by *Al Thani*, the leading case in this District on the issue of redactions from text messages and one authored by the district judge who presides over this very litigation. *Al Thani* holds squarely that "parties may not unilaterally redact otherwise discoverable" information from text messages for reasons other than privilege. *Al Thani*, 2022 WL 1684271, at *2. Yet that is precisely what Plaintiffs did: they unilaterally redacted non-privileged text messages. It should have been clear to Plaintiffs that *Al Thani* operated as a default rule forbidding redactions in text message chains absent a judicial decision, or an agreement by Defendants, permitting redactions.

Plaintiffs argue that *Al Thani* is distinguishable on various grounds, including that the text messages there were redacted by the client, rather than by counsel; that the producing party there failed to produce other messages in the text chain that provided context for the responsive messages, whereas Plaintiffs state that they produced any "related messages that provide context"; that the text communications there were between two defendants from different organizations rather than between co-workers within the same organization; and that the court there compelled production of hundreds of additional text messages, whereas Plaintiffs claim they would be required to produce tens of thousands of additional text messages. (Dkt. No. 66 at 3; *see also* Tr. at 15:2-16:15). Whether these are

11

good grounds for distinguishing *Al Thani* is debatable, and vigorously contested by Defendants. (Dkt. No. 64 at 2 (arguing that "*Al Thani* is squarely on point"); *see also* Tr. at 16:18-18:12).[3] Whatever the merits of their proffered distinctions, if Plaintiffs wanted to make redactions without Defendants' agreement, Plaintiffs needed to seek court permission to do so. Having formed an agreement with Defendants that resulted in Defendants' production of unredacted text messages, Plaintiffs were not free to decide on their own that redactions to Plaintiffs' production were appropriate.

Judge Aaron's decision in *In re Actos Antitrust Litigation*, 340 F.R.D. 549 (S.D.N.Y. 2022), is instructive. *Actos* involved "email threading," *i.e.*, the production of a final email chain in lieu of producing each separate constituent email. The parties in *Actos* had negotiated a Discovery Protocol governing ESI. *Id*. at 550-51. A discovery dispute arose because defendants thereafter made productions "using email threading even though the Discovery Protocol, by its terms, did not permit such approach." *Id*. at 551. This meant, *inter alia*, that plaintiffs were unable to access metadata associated with earlier emails in a chain, impairing their ability to search for all correspondence within a given date range. *Id*. at 552. Judge Aaron rejected defendants' unilateral decision to use email threading and required them to produce the earlier-in-time emails, explaining:

> If the issue of email threading had been raised at the time the parties were negotiating the Discovery Protocol, Plaintiffs may have been able

---

[3] For example, although Plaintiffs state they only redacted messages that neither were responsive nor provided context for the responsive messages, *Al Thani* did not, at least not explicitly, approve redactions on that basis. Rather, the court ordered production of the withheld text messages "in their entirety" and without any redactions. *See Al Thani*, 2022 WL 1684271, at *3.

> to ameliorate the foregoing issues by including, for example, a protocol provision requiring the exchange of certain metadata for any excluded, lesser-included emails. However, Plaintiffs were not provided the opportunity to negotiate how email threading might be accomplished in an acceptable manner. In the circumstances presented, and based upon careful review of the parties' submissions, the Court, in its discretion, declines to impose email threading on Plaintiffs.

*Id.*

The Court finds this reasoning to be persuasive and applicable here. If Plaintiffs wanted to redact their text messages, it was incumbent upon them to negotiate an agreement to that effect with Defendants or, in the absence of an agreement, bring the issue to the Court for resolution before Defendants made their production. It would be unfair to allow Plaintiffs access to Defendants' unredacted text messages while simultaneously permitting Plaintiffs to redact their own text messages.[4] Although Defendants can also be faulted for not raising the question of redactions, it was more reasonable for Defendants to understand that the agreement precluded redactions than it was for Plaintiffs to assume they were permitted, given the traditional rules governing discovery. It is not as if the parties had agreed that redactions were permissible with respect to other document discovery. To the contrary, Plaintiffs' counsel acknowledged that Plaintiffs produced emails without redactions, even though the parties followed the "same principle" for emails as they did for text messages—*i.e.*, they agreed to run search

---

[4] At the December 6 discovery conference, Plaintiffs said they would have no objection to allowing Defendants to retroactively redact Defendants' text messages. (Tr. at 33:20-34:14). That offer comes too late, however, as Plaintiffs' counsel acknowledged that it has already reviewed at least some of the text messages Defendants have produced (although it has not provided them to its clients). (*Id.*).

terms, review documents that hit on the search terms, and produce documents found to be responsive. (Tr. at 14:20-25, 40:13-41:7).

Accordingly, as in *Actos*, the Court construes the absence of a provision in the parties' agreement allowing redaction of text messages to preclude Plaintiffs from unilaterally making such redactions. Plaintiffs must produce unredacted versions of non-privileged text messages subject only to the limitations described below.

### D. Highly Sensitive Text Messages

Plaintiffs request permission, in the alternative, to redact or to produce on an "Attorneys' Eyes Only" basis certain text messages they describe as not only unrelated to the issues in this case, but containing personal or intimate information, competitively sensitive information, political discussions or views, or other embarrassing information (the "Highly Sensitive Text Messages"). (*See* Dkt. No. 66 at 3; Tr. at 36:4-14). At the discovery conference on December 6, Defendants indicated that they are amenable to considering an amendment to the existing Stipulation and Protective Order in this case that would allow for Highly Sensitive Text Messages to be designated "Attorneys' Eyes Only." (Tr. at 38:4-16; *see* Dkt. No. 57).

In *Al Thani*, Judge Cronan noted that a court "may, under certain circumstances, permit redactions where there is 'a finding of "good cause" based on a need "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."'" *Al Thani*, 2022 WL 1684271, at *2 (quoting *Howell v. City of N.Y.*, No. 06 Civ. 6347 (ERK) (VVP), 2007 WL 2815738, at *2 (E.D.N.Y. Sept.

14

25, 2007) (quoting Fed. R. Civ. P. 26(c)(1)).  Having reviewed the text messages at issue in unredacted form, Judge Cronan concluded that none of the messages presented such a risk, and hence did not authorize redactions on this basis.  *See id*.  However, based on counsel's representations, some text messages in this case may present such a risk and merit different treatment.

The Court therefore directs the parties to meet and confer with respect to affording special treatment to Highly Sensitive Text Messages.  Such special treatment could take the form of (i) amending the existing Protective Order to permit Attorneys' Eyes Only designation for Highly Sensitive Text Messages; (ii) arranging for opposing counsel to review Highly Sensitive Text Messages at a party's counsel's office to confirm for themselves that such messages are not relevant, in which case the party may redact the messages from its production; (iii) permitting redactions of particular categories of Highly Sensitive Text Messages; or (iv) such other form of treatment as counsel may reasonably agree upon.  Whatever allowances are agreed to for purposes of Plaintiffs' text message production should also be made available to Defendants for purposes of their production in the event Defendants have any Highly Sensitive Text Messages.

The parties shall provide the Court with a written status update regarding their discussions by no later than three weeks after the date of this Order.

## CONCLUSION

For the reasons set forth above, Defendants' motion is **GRANTED** subject to the meet-and-confer obligation described in this Order.  The Clerk of Court is respectfully directed to close the motion pending at Docket Number 64.

**SO ORDERED.**

DATED:   December 18, 2024
         New York, New York

*/s/ Gary Stein*
The Honorable Gary Stein
United States Magistrate Judge